Michael D. Rounds, Nevada Bar No. 4734
Adam K. Yowell, Nevada Bar No. 11748
WATSON ROUNDS
5371 Kietzke Lane
Reno, Nevada  89511-2083
Telephone:  (775) 324-4100
Facsimile:  (775) 333-8171
E-Mail:  mrounds@watsonrounds.com
E-Mail:  ayowell@watsonrounds.com

Russell E. Levine, P.C., *pro hac vice*
Craig D. Leavell, *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
E-Mail:  russell.levine@kirkland.com
E-Mail:  craig.leavell@kirkland.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT BOSCH LLC, <br><br>       Plaintiff, <br><br>   vs. <br><br> ADM 21 CO. LTD.; ADM USA; and ADM NORTH AMERICA, <br><br>       Defendants. | Civil Action No. 2:10-CV-1930-LRH-LRL |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF[1]

---

[1]  Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Alternative Motion to Transfer has been pending before this Court since December 15, 2010.  *See* Dkt. Nos. 20, 25, 46, and 48.  Defendants submit this Opening Claim Construction brief without waiving any arguments regarding its pending motions to dismiss and/or transfer.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................... 1

II.  THE APPLICABLE LAW ....................................................................................... 2

    A.  Legal Standards for Claim Construction .......................................................... 2

    B.  Legal Standards for Indefiniteness .................................................................. 4

III.  THE PROPER CONSTRUCTION OF THE '698 PATENT ................................. 5

    A.  "An Elongated Spring-Elastic Carrying Element Disposed on a Side of the Wiper Strip Remote from the Window" ............................................................ 6

    B.  "Spherically Curved Window" ........................................................................ 8

    C.  "Concave Curvature that is Sharper than the Sharpest Curvature of a Spherically Curved Window in a Region of a Wiping Field that can be Swept Across by Said Wiper Blade" ........................................................................... 10

    D.  "Said Wiper Strip Having a Center Section and Two End Sections, Said Contact Force of Said Wiper Strip Being Greater in Said Center Section Than in At Least One of Said Two End Sections" .................................................... 11

    E.  "A Concave Curvature in Said Center Section of the Carrying Element is Sharper than in Said Sections Thereof" ......................................................... 13

IV.  THE PROPER CONSTRUCTION OF THE '905 PATENT ................................. 15

    A.  "An Upper Band Surface (11) of the Support Element (12; 30, 30) has a Wind Deflection Strip (42) Disposed on it" ............................................................. 15

    B.  "Wherein the Two Diverging Legs are Connected to Each Other at a Common Base" ............................................................................................................... 16

    C.  "The Legs (44, 46) Form Therebetween an Angular Hollow Space that Expands from an Upper Narrowest Point of the Base Downwardly to the Upper Band Surface of the Support Element" ............................................... 18

    D.  "Said Legs Contacting the Upper Band Surface at a Location Laterally Spaced from said Rubber-Elastic Wiper Strip" ............................................................ 19

    E.  "The Two Legs (44, 48) of the Wind Deflection Strip (142 or 242) are Connected to Each Other by Means of a Wall (144 or 244) in the Vicinity of the Two Wiper Blade Ends" ........................................................................... 20

    F.  "The Wall (144) is Aligned Essentially Perpendicular to the Support Element" ............. 21

    G.  "Claw-Like Projections (56, 58)" ................................................................. 22

    H.  "Wherein a Hardness of the Material for the Wind Deflection Strip (42) is at Most 40 Percent Greater than the Hardness of the Material for the Wiper Strip" ............................................................................................................... 23

ii

I.   "The Claw-Like Projections Extend from the Leg Ends (50, 52) into a Vicinity of a Wall (154 or 254), and Suitably Encompass End Regions (112) of the Support Element"...............................................................................24

J.   "End Regions" ...............................................................................................26

V.   **THE PROPER CONSTRUCTION OF THE '607 PATENT** ................................**26**

A.   "On a Free End of Said Arm is Fixed On One End of a Cantilevered Joint Pin (56) with a Joint Axis".......................................................................................27

B.   "The Bearing Bore (36) is Disposed in the Coupling Part (30) Near One End Thereof".........................................................................................................28

VI.  **CONCLUSION** ......................................................................................................**30**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ........................................................................ 5, 13, 24, 28

*Atofina v. Great Lakes Chem Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ...................................................................................... 3

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) .................................................................................... 29

*Chef America, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ............................................................................. 14, 21

*Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
    535 U.S. 722 (2002) ................................................................................................... 4

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ................................................................................ 5, 28

*Halliburton Energy Services, Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ............................................................................. 4, 5, 11

*Halo Electronics, Inc. v. Pulse Engineering, Inc.*,
    721 F. Supp. 2d 989 (D. Nev. 2010) ............................................................................ 5

*Honeywell Intern., Inc. v. International Trade Com'n*,
    341 F.3d 1332 (Fed. Cir. 2003) .................................................................................... 5

*International Rectifier Corp. v. IXYS Corp.*,
    361 F.3d 1363 (Fed. Cir. 2004) .................................................................................... 9

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ....................................................................................... 3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................. 2, 3

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) .................................................................................... 4

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) .................................................................................... 5

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942) ................................................................................................... 5

**Statutes**

35 U.S.C. § 112...................................................................................................................... passim

**Other Authorities**

Manual of Patent Examining Procedure §2173.05(e), Lack of Antecedent Basis............................. 13

## I.  INTRODUCTION

Since 1967, ADM has been devoted to serving its customers with quality wiper blade products at competitive prices.[2]  ADM designs and develops a large portfolio of wiper blade products, and has received numerous awards.  ADM is a leader in the conventional wiper blade market, and also makes beam-type blades that are growing in popularity.[3]  ADM and Robert Bosch LLC ("Bosch"), along with Bosch's German affiliate, Bosch GmbH, have been competing for years.

In November 2010, Bosch sued ADM, alleging infringement of U.S. Patent Nos. 6,973,698 ("the '698 patent"), 6,944,905 ("the '905 patent"), and 6,553,607 ("the '607 patent") (collectively, "the patents-in-suit").  The patents-in-suit generally relate to wiper blades and/or wiper arms.

Bosch has not kept pace with innovation in the beam-type wiper blade market.  Bosch has resorted, instead, to litigation in an attempt to exclude competition.  Indeed, in addition to this suit, Bosch has filed suits against thirteen other wiper blade manufacturers, including three in the Northern District of Illinois (Case No. 1:11-cv-0243, filed 4/11/2011), and one in the District of Delaware (Case No. 1:08-cv-00542-SLR-MPT, filed 8/25/08).

Pursuant to this Court's Scheduling Order (Dkt. 39), the parties exchanged lists of terms for claim construction and then proposed constructions.[4]  Despite the fact that ADM identified seventeen claim construction issues to discuss with Bosch, Bosch proposed constructions for only three.  *Compare* Ex. 5, 3/21/2011 Ltr. from ADM Counsel to Bosch Counsel, *to* Ex. 6, 4/8/2011 Ltr. from Bosch Counsel to ADM Counsel.  As such, because Bosch failed to meet the April 8, 2011 Court Ordered deadline to

---

[2] Bosch's Complaint names "ADM USA and ADM North America" as two of the three defendants.  Neither is an actual entity.  ADM 21 Co. Ltd., is a Korean-based entity, and ADM 21 Co. (North America) Ltd., is its United States subsidiary located in New Jersey (collectively herein "ADM").

[3] Conventional (or traditional) wiper blades have multiple levels of brackets, whereas beam blades are bracketless.  This case involves ADM's beam blades, but not its conventional blades.

[4] Ex. 1 is a list of all the terms addressed by this brief, and the parties' proposed constructions.  Ex. 24 is the claim language at issue within the context of the claims.  *See also* Ex. 5, 3/21/2011 Ltr. from ADM Counsel to Bosch Counsel; Ex. 7, 3/21/2011 Ltr. from Bosch Counsel to ADM Counsel;  Ex. 8, 4/8/2011 Ltr. from ADM Counsel to Bosch Counsel; Ex. 6, 4/8/2011 Ltr. from Bosch Counsel to ADM Counsel.

provide its proposed constructions, Bosch waived its right to propose constructions for all but these three disputed terms.[5]

Guidance from this Court on all of the terms addressed in this brief is necessary to resolve issues concerning infringement and invalidity.  Specifically, construction of these terms is required for the parties to evaluate whether certain prior art references render the claims invalid and whether ADM's accused products contain the asserted claim limitations.  For some terms, it may not be possible to construe them because these terms are indefinite in violation of the Patent Act.[6]  This Court, however, cannot "fix" the indefiniteness nor construe the claims to cover what Bosch, in litigation hindsight, wishes it would have claimed, as opposed to what Bosch, in fact, claimed in its applications.  To do so would be legal error.  Rather, the Court is to construe the claims based on the ordinary and customary meaning of the claim terms, viewed in light of how they are used in the claims themselves, how they are disclosed and discussed in the patent specification, and consistent with the prosecution history.  ADM's proposed constructions are based on these fundamental tenets of claim construction and thus are the proper constructions, which should be adopted by this Court.

## II.     THE APPLICABLE LAW

### A.     Legal Standards for Claim Construction

The words of the claims define the scope of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") (citations omitted).  Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312

---

[5]  ADM notified Bosch of this position the very next business day.  *See* Ex. 9, 4/11/11 Ltr. from ADM Counsel to Bosch Counsel.

[6]  The patents-in-suit each stem from German applications and were translated into English for filing in the U.S.  However, it appears this translation was not done with precise care as to the guidelines of 35 U.S.C. § 112.  Indeed, the Patent Office pointed out 35 U.S.C. § 112 issues during prosecution of each of the patents-in-suit.  *See, e.g.*, Ex. 10, '698 File History, 12/21/00 Office Action at p. 2-3; Ex. 11, '905 File History, 6/28/04 Office Action at p. 2-3; Ex. 12, '607 File History, Interview Summary of 12/20/02 Interview.

(citations omitted).  The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention…" *Phillips*, 415 F.3d at 1313.  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  Thus, to ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  This so-called intrinsic evidence has the greatest weight in construing the claims.  *See Phillips*, 415 F.3d at 1317; *see also Atofina v. Great Lakes Chem Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006).

"[T]he specification 'is always highly relevant to the claim construction analysis.'"  *Phillips*, 415 F.3d. at 1315 (citations omitted).  Indeed, the specification is "the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d. at 1315 (citations omitted).  Nevertheless, the specification is not the only source that provides guidance for claim construction.  The intrinsic evidence also includes statements and amendments the inventors made to distinguish the prior art.  *See Phillips*, 415 F.3d at 1317; *see also Atofina*, 441 F.3d at 997.  The prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

A court may also consider extrinsic evidence to ascertain the common meaning of terms. *Phillips*, 415 F.3d at 1317.  Extrinsic evidence includes "expert and inventor testimony, dictionaries, and

learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980).  The extrinsic evidence is important because it allows the court to place itself in the context of one of ordinary skill and helps insure that the court does not interpret terms in a way that is inconsistent with the clear understanding in the field.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

### B.    Legal Standards for Indefiniteness

The monopoly given to a patent holder is a property right, "and like any property right, its boundaries should be clear."  *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 730 (2002).  35 U.S.C. § 112 outlines the requirements for patent specifications and claims. That section states that for a patent claim to be valid, it must be definite:  "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."   35 U.S.C. § 112, ¶2.   The Supreme Court instructed in *Festo* that the disclosure requirements of § 112 are necessary to provide the public with notice of the boundaries of the patent rights, and thereby promote innovation. According to the Court:

> The patent laws "promote the Progress of Science and useful Arts" by rewarding innovation with a temporary monopoly. U.S. Const., Art. I, §8, cl.8. The monopoly is a property right; and like any property right, its boundaries should be clear. This clarity is essential to promote progress, because it enables efficient investment in innovation. ***A patent holder should know what he owns, and the public should know what he does not.*** For this reason, the patent laws require inventors to describe their work in "full, clear, concise, and exact terms," 35 U.S.C.A. § 112, as part of the delicate balance the law attempts to maintain between inventors, who rely on the promise of the law to bring the invention forth, and the public, which should be encouraged to pursue innovations, creations, and new ideas beyond the inventor's exclusive rights.

*Festo Corp.*, 535 U.S. at 730–31 (2002) (emphasis added).

As such, "[b]ecause claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent.  Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  In other words, the

definiteness requirement ensures that competitors are able to determine the claim's metes and bounds. *See Honeywell Intern., Inc. v. International Trade Com'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003). Claims that are indefinite are invalid. *See Amgen*, 314 F.3d at 1342.

The definiteness requirement is met "only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *Halliburton*, 514 F.3d at 1249 (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)). "A claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not." *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (patent claim indefinite where a given embodiment would infringe or not infringe depending on the particular bacteria chosen for analysis); *see also Amgen*, 314 F.3d at 1342 (Fed. Cir. 2003) (patent claim indefinite where there were two ways to measure the term "difference" as used in the claim and patent failed to identify a single standard by which to measure that term).

Whether or not a claim term is indefinite is an issue of law for the Court to be made during claim construction. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1318 (Fed. Cir. 2008); *see also Halo Electronics, Inc. v. Pulse Engineering, Inc.*, 721 F. Supp. 2d 989, 995-996 (D. Nev. 2010). Accordingly, ADM respectfully requests that this Court make the finding in its Claim Construction Order that certain affected claims are indefinite and therefore invalid as a matter of law.

## III.   THE PROPER CONSTRUCTION OF THE '698 PATENT

The '698 patent generally relates to a wiper blade having a certain claimed curvature and claimed contact force as it is pushed against a window. *See generally* Ex. 4, '698 patent. Bosch accuses ADM's XF4 wiper blade product of infringing claim 1 of the '698 patent (the only claim of the patent). As an initial matter, the claim is fraught with indefinite claim limitations requiring knowledge of the

curvature of a window with which the blade is to be used, and the precise force applied into a wiper blade by a wiper arm with which the blade is to be used. The accused product is **only** a wiper blade—absent a wiper arm pushing the wiper blade against a spherically curved window, no force can exist and no curvature comparison can be made. But ADM does not make or sell windshields of any type, much less spherically curved windshields. Nor does ADM sell any wiper arms that are accused of infringement in this case. The accused products are simply wiper blades, without wiper arms and without windshields.

A. **"An Elongated Spring-Elastic Carrying Element Disposed on a Side of the Wiper Strip Remote from the Window"**

| Claim Term | |
|---|---|
| an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | an elongated spring-elastic carrying element is attached on one side of the wiper strip—the side away from the window |

This phrase appears in claim 1 of the '698 patent (the only claim of the patent), and describes the location of the spring-elastic carrying element (the "backbone" of the wiper blade), in relation to the wiper strip (the soft piece of rubber that contacts the windshield and does the actual wiping). ADM's construction is consistent with the specification and prosecution history of the '698 patent.

The specification of the '698 patent explains that the entirety of the wiper strip is located on the underside of the spring-elastic carrying element. *See* Ex. 4, '698 patent, 3:6-8 ("The elongated, rubber-elastic wiper strip 14 is disposed on the underside of the carrying element 12 oriented toward the window 15."). Moreover, the specification and its figures make clear that the carrying element is located on only one side of the wiper strip piece: "As shown by the not-to-scale FIGS. 3 and 4, the wiper strip 14 is disposed on the lower band surface of the carrying element 12 oriented toward the window 15." Ex. 4, '698 patent, 3:38-41, Fig. 3, Fig. 4.

6



Likewise, during prosecution of the '698 patent, the patent applicants emphasized that the wiper strip is wholly disposed on one side of the carrying element: "Claim 14 has been particularly amended to define that the carrying element has the first and second sides, wherein the wiper strip is arranged at the first side . . ." Ex. 13, '698 File History at Sept. 26, 2001 Response to 7/27/2001 Office Action, p. 5-6.  In making this argument, Bosch was aware of prior art cited on the face of the '698 patent where the wiper strip projected through the carrying element, such that the wiper strip was on ***both*** sides of the carrying element.  *See* Ex. 14, Appel, U.S. Patent No. 3,192,551, issued 6/6/65, 3:63-69 ("With reference to FIGS. 4-6 a spring backbone element 36 of the type illustrated in FIGS. 2a-2c may be adapted to carry a conventional rubber wiping blade 37 by providing a slot 38 extending almost throughout the length and terminating just short of the end 39 for accommodating a flanged rib 40 of the rubber blade projecting therethrough.").  In the '698 patent, Bosch took a different approach, putting the wiper strip all on one side of the carrying element.  Accordingly, this Court should construe this term as: an elongated spring-elastic carrying element is attached on one side of the wiper strip—the side away from the window.

## B.    "Spherically Curved Window"

| Claim Term | |
|---|---|
| spherically curved window | |
| **Bosch Proposed Construction** | **ADM Proposed Construction** |
| window having at least one radius of curvature[7] | window with same radius of curvature at all points in every direction |

In the '698 patent, the term "spherically curved window" describes the particular curvature of a window with which the wiper blade is used.  ADM's proposed construction is consistent with the plain and ordinary meaning of the word "spherically."  *See* Ex. 15, Webster's II New College Dictionary 1062 (1995, 1999, 2001) ("sphere.  1.  A three dimensional surface all points of which are equidistant from a fixed point.  2.  A spherical figure or object.").  ADM's construction is also consistent with the specification of the '698 patent, which shows a cut-away of a spherically curved window (reference numeral 15) in Figure 2.  *See* Ex. 4, '698 patent, Fig. 2, 2:38-39 ("FIG. 2 is a schematic representation of a side view of an unloaded wiper blade placed against the window…"):



Indeed, the specification <u>never</u> uses the phrase "curved window" without the qualifier, "***spherically*** curved window."  *See* Ex. 4, '698 patent at 2:7, 2:24, 3:26-27, 4:48-49, 5:8 (emphasis added).  ADM's construction gives the word "spherically" an accurate meaning by explaining what it means for a window to be "spherically" curved:  having the same radius of curvature at all points in

---

[7]  Bosch's original proposed construction for this term was:  "generally curved window."  Five days ***after*** the deadline imposed by this Court for the parties to exchange proposed claim constructions, Bosch informed ADM of this "updated" proposed construction.  *See* Ex. 16, 4/13/11 Ltr. from Bosch Counsel to ADM Counsel.

every direction.  This distinguishes a "spherically" curved surface from any other type of curved surface.

Bosch's construction, on the other hand, is an improper attempt to read the word "spherically" entirely out of the claim, in an effort to bolster its allegations through an overly broad construction. Bosch ignores the requirement that the curved window be "spherically" curved, proposing a construction covering a window with merely "at least one" radius of curvature—in other words, windows that are ***not*** "spherically" curved.  That position is untenable, and contrary to controlling law.  If an inventor uses narrow claim language, a court may not apply a broader construction, even if one of skill would recognize that, in practice, the broader language was more likely to result. *See, International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363 (Fed. Cir. 2004) (district court erred in broadly construing "polygonal" to include shapes with curved corners where the ordinary meaning of the term required straight sides and well-defined angles):

> While IR is correct that the meaning of claim terms must be considered from the perspective of one of ordinary skill in the art, ***that does not mean that the inventor's choice of words may be ignored*** . . . ***The district court's construction, relaxing the requirements so much as to allow round corners and not straight edges, is erroneous.***  The correct construction of the term "polygonal," consistent with the written description, is simply "a closed plane figure bounded by straight lines."  ***The patentee***, being fully aware of the effects of the doping process, ***could have claimed the regions more broadly but chose to use the word "polygonal" without modification or qualification.***  The district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice.

*Id.* at 1371–72 (citations omitted) (emphasis added).

In sum, the phrase "spherically curved window" should be construed to reflect the fact that the window is formed in a spherical shape—having the same radius of curvature at all points in every direction—as opposed to any other curved shape.

9

**C.    "Concave Curvature that is Sharper than the Sharpest Curvature of a Spherically Curved Window in a Region of a Wiping Field that can be Swept Across by Said Wiper Blade"**

| Claim Term | |
|---|---|
| concave curvature that is sharper than the sharpest curvature of a spherically curved window in a region of a wiping field that can be swept across by said wiper blade | |
| **Bosch Proposed Construction** | **ADM Proposed Construction** |
| concave curvature that is greater than the greatest curvature of a window having at least one radius of curvature in a region of a wiping field that can be swept across by the wiper blade[8] | Indefinite |

In the '698 patent, this phrase is used to describe the curvature of a wiper blade as compared to the curvature of a spherically curved window.  In order to assess whether a wiper blade meets this claim limitation, one must know the radius of curvature of the window for which a wiper blade will be used.  Only then can one compare this curvature to the curvatures in the carrying element of its wiper blade to determine whether or not a design could potentially infringe (or similarly, whether a prior art wiper blade anticipates the claim).  The patent or file history does not specify a window radius of curvature to use to apply to the claim.  A manufacturer of wiper blades cannot know whether or not it infringes unless it knows the window the blade is applied against.  Whether or not a wiper blade product's curvature meets the claim requirement will vary based on the set of circumstances under which the wiper blade is used.  Indeed, the specification even explicitly states that window types differ:

> The different designs of the wiper blade can be required by particular ***window types, which differ from one another, for example due to the type of spherical curvatures of the windows.***

Ex. 4, '698 patent, 4:46-49 (emphasis added).

Bosch's proposed construction does not cure this ambiguity—indeed, it bolsters the notion that this claim limitation is indefinite.  In a spherically curved window (as the claim language requires) a

---

[8]  Bosch's original proposed construction for this term was:  "concave curvature that is greater than the greatest curvature of a generally curved window in a region of a wiping field that can be swept across by the wiper blade."  Five days ***after*** the deadline imposed by this Court for the parties to exchange proposed claim constructions, Bosch informed ADM of this "updated" proposed construction.  *See* Ex. 16, 4/13/11 Ltr. from Bosch Counsel to ADM Counsel.

single radius of curvature exists.  On the other hand, according to Bosch's proposed construction, the window could have an infinite number of radii of curvature at an infinite number of points on a window. Therefore, under Bosch's construction the number of possibilities for the radius of curvature to be applied as the comparison point, is limitless.

Because a potential competitor must make a separate determination for every set of circumstances under which a wiper blade could possibly be used—and because such determinations are likely to result in differing outcomes where sometimes the product infringes, and sometimes it does not—the phase "concave curvature that is sharper than the sharpest curvature of a spherically curved window in a region of a wiping field that can be swept across by said wiper blade," as used in the '698 patent is indefinite for failure to comply with 35 U.S.C. § 112.  *See Halliburton Energy Services*, 514 F.3d at 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite.").

D.   **"Said Wiper Strip Having a Center Section and Two End Sections, Said Contact Force of Said Wiper Strip Being Greater in Said Center Section Than in At Least One of Said Two End Sections"**

| Claim Term |
| --- |
| said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections |

| Bosch Proposed Construction | ADM Proposed Construction |
| --- | --- |
| no construction proposed | Indefinite |

In the '698 patent, this phrase is used to make a comparison between a contact force of a wiper strip as it is pushed against a window, at the "center section" of the wiper strip, as compared to one of two "end sections" of the wiper strip.  The trouble with this claim language is that the claim, specification and prosecution history do not define what is meant by the terms "center section" and "end

section."

The specification in Figures 5 and 8 use label "36" to identify the "center section," and labels "38" to identify the "end section."  *See* Ex. 4, '698 patent at 4:16-20; 4:50-58.



Yet, these figures, along with the specification, provide no guidance as to what part or piece of the "center section" or "end section" must be selected to make this force comparison.[9]  That the claim uses the word "section" to describe the center and end, as opposed to something like "point," means that the force to be compared is over some length at the center and end of the blade.  This ambiguity is even more glaring when evaluating actual force profile measurements, as opposed to the force profiles illustrated in Figures 5-7, which show a singular smooth curve.[10]  Even if a particular length was disclosed in the specification, the patent does not explain how to come up with a singular force magnitude—whether it is an average of the force over a particular length, or mean of the force over a particular length.  A competitor has no guidance on how to do this comparison, and importantly, the issue of whether a wiper blade meets this claim limitation will change based on the area over which "center section" and "end section" are defined, and whether the force measurements should be taken as an average or the mean within an unspecific "section" of unknown length.

---

[9]  *See also* Ex. 17, Webster's II New College Dictionary 998 (2001) ("section.  1. A part or piece of something: PORTION.")

[10]  *See* Ex. 18, Exemplary force profile plot for flat wiper blades sold by a third party.

Because a competitor has no guidance on how to define a "center section" or "end section" of a wiper blade—and because determinations of infringement and/or invalidity result in differing outcomes where sometimes the product infringes (or anticipates), and sometimes it does not—the phrase "said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections," as used in claim 1 of the '698 patent, is indefinite for failure to comply with 35 U.S.C. § 112.  *See e.g. Amgen*, 314 F.3d at 1342 (Fed. Cir. 2003) (holding patent claim indefinite where there were two ways to measure the term "difference" as used in the claim and patent failed to identify a single standard by which to measure that term).[11]

### E.     "A Concave Curvature in Said Center Section of the Carrying Element is Sharper than in Said Sections Thereof"

| Claim Term |
| --- |
| a concave curvature in said center section of the carrying element is sharper than in said sections thereof |

| Bosch Proposed Construction | ADM Proposed Construction |
| --- | --- |
| a concave curvature in the center section of the carrying element is greater than at the ends of the wiper blade | Indefinite |

The '698 patent uses this phrase to compare the curvature of a wiper blade in different "sections" of the blade.  As an initial matter, the same issues that plague the phrase "center section" in the context of force profiles, as described above, cause the same end-result of indefiniteness for the use of the phrase "center section" when used in the context the curvature of the wiper blade.  The claim, specification and prosecution history fail to describe the metes and bounds of the phrase "center section."  For example, it does not explain the measurement of length for which the curvature evaluated, nor does it explain how, if a length is indeed established, how one is to determine a singular curvature

---

[11]   On March 21, 2011, ADM identified this limitation as being in need of construction in a letter to Bosch.  *See* Ex. 5, 3/21/11 Ltr. from ADM Counsel to Bosch Counsel.  Despite the obvious ambiguity in the limitation's wording, Bosch elected not to construe the term.  *See* Ex. 6, 4/8/11 Ltr. from Bosch Counsel to ADM Counsel.  But, as discussed above, there is not a single reasonable "plain meaning" to this term.  Bosch's inability to point to one meaning or another is further evidence that this term is insolubly ambiguous and therefore indefinite.

for a wiper blade having varying radii of curvature throughout its length.   For this reason alone, the phrase "a concave curvature in said center section of the carrying element is sharper than in said sections thereof" fails to comply with 35 U.S.C. § 112.

Furthermore, the phrase "a concave curvature in said center section of the carrying element is sharper than in *said sections* thereof" is also indefinite because it lacks antecedent basis—the claim does not define what "section" the phrase "said sections" refers to.   *See* Manual of Patent Examining Procedure §2173.05(e), Lack of Antecedent Basis ("A claim is indefinite when it contains words or phrases whose meaning is unclear. . . if two different levers are recited earlier in the claim, the recitation of "said lever" in the same or subsequent claim would be unclear where it is uncertain which of the two levers was intended.   A claim which refers to 'said aluminum lever,' but recites only 'a lever' earlier in the claim, is indefinite because it is uncertain as to the lever to which reference is made.").   In other words, it is ambiguous what "section" of the wiper blade to use to compare with the curvature in the "center section."   The claim earlier refers to "end sections," but it is not clear whether "end sections" is referred to in "said sections," or whether it is an entirely different undefined "section" of the blade.   The claim provides no guidance in this regard.

Bosch proposed construction—"a concave curvature in the center section of the carrying element is greater than *at the ends of the wiper blade*"—does not cure this ambiguity.   First, it is entirely unclear how the patent supports such a construction.   The plain claim language recites a generic "section."   If the patent drafter meant to use the word "ends" it certainly could have done so.   But more importantly, Bosch's proposed construction reads out the word "section" entirely.   The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity. . . [I]n accord with our settled practice we construe the claim as written, not as the patentees wish they had written it."   *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).   Moreover, the plain and ordinary meaning of "section" denotes a part or piece of

14

something.[12]   Nevertheless, Bosch seeks to construe "said sections" to mean "*at* the ends of the wiper blade," presumably meaning a singular point at the very tip of the blade.   This construction is nonsensical because in order to have a curvature there must be some area over which to measure a curve.   Therefore, Bosch's proposed construction serves to inject further ambiguity into the claim.   For all of the above listed reasons, the phrase "a concave curvature in said center section of the carrying element is sharper than in said sections thereof" is indefinite.

## IV.   THE PROPER CONSTRUCTION OF THE '905 PATENT

The '905 patent generally relates to a wiper blade having a wind-deflection strip, or spoiler, on it. *See generally*, Ex. 3, '905 patent.  Bosch accuses ADM's XF4 wiper blade product of infringing seven claims in the '905 patent (independent claim 1, its dependent claims 3, 4, 8, 10, and 11, and independent claim 15).  Bosch's claims for a wind deflection strip, or spoiler, on a wiper blade are not new—indeed, this feature was well known in the prior art at the time Bosch submitted its patent application.  In fact, the field of art was so crowded, that Bosch was forced to add a very narrow limitation regarding the precise shape and position of spoiler's legs in order to get the patent allowed.  Moreover, the claims are fraught with indefinite claim limitations.

### A.   "An Upper Band Surface (11) of the Support Element (12; 30, 30) has a Wind Deflection Strip (42) Disposed on it"

| Claim Term | |
|---|---|
| an upper band surface (11) of the support element (12; 30, 30) has a wind deflection strip (42) disposed on it | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | an upper band surface (11) of the support element (12; 30, 30) has a wind deflection strip (42) along its entire length |

This term appears in claims 1 and 15 of the '905 patent and is used to describe the positional relationship of the wind deflection strip.  ADM's proposed construction is consistent with the disclosure

---

[12] *See also* Ex. 17, Webster's II New College Dictionary 998 (2001) ("section.  1.  A part or piece of something:  PORTION.")

of the '905 patent.  Figure 1 is a perspective representation of a wiper blade according to the alleged invention:



FIG.1

Ex. 3, '905 patent, Figure 1.  As is evident from the above figure, the wind deflection strip (denoted as 42 on the drawing) of the alleged invention disclosed in the '905 patent, exists along the entire length of the support element (labeled as 12 in the drawing).  This Court should adopt ADM's proposed construction because it clarifies that the entirety of the length of the support element has a wind deflection strip on it, as is disclosed in the '905 patent.

**B.    "Wherein the Two Diverging Legs are Connected to Each Other at a Common Base"**

| Claim Term | |
|---|---|
| wherein the two diverging legs are connected to each other at a common base (48) | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | wherein the two diverging legs throughout their lengths meet at a shared point (48) |

The claim limitation, "wherein the two diverging legs are connected to each other at a common base," appears in claims 1 and 15 of the '905 patent.  It is used to describe how the two legs of the wind deflection strip are connected to each other.  ADM's proposed construction—wherein the two diverging legs throughout their lengths meet at a shared point—is supported by the language in the claim, as well as the specification.  Every example throughout the entirety of the specification consistently shows a uniform cross section, in which the two legs meet at a shared common base along the entirety of the blade.

16

The language of claim 1 further explains that the legs are connected at a "point":

> wherein the two diverging legs are connected to each other at a common base (48) . . . and the legs (44, 46) form therebetween an angular hollow space that expands ***from an upper narrowest <u>point</u> of the base*** downwardly to the upper band surface of the support element (12; 30, 30).

*See* Ex. 3, '905 patent, claim 1, 7:5-14 (emphasis added).  The specification shows the two legs meeting in Figures 2 and 3, where item number 48 represents the "common base."  Ex. 3, '905 patent, Figs. 2 and 3.



The specification further affirms that the meeting of the legs at a shared point continues throughout the length of the wind deflection strip:  "The cross sectional form of the wind deflection strip 42 . . . shown in FIGS. 2 and 4 is the same over the entire length so that these sections can be inexpensively extruded."  *Id.* at 4:51-54.[13, 14]  Accordingly, this Court should construe this term as: wherein the two diverging legs throughout their lengths meet at a shared point (48).

---

[13]  Furthermore, the plain meaning of the word "common" supports ADM's construction.  *See* Ex. 19, Webster's II New College Dictionary 226 (2001, 1999, 1995) ("common 1. a. belonging to, shared by, or applying equally").

[14]  In the extrusion molding process, a long continuous shape is made, similar to squeezing a tube of toothpaste out of a tube.  In contrast, a process known as injection molding uses individual molds to create objects and is considered to be higher-quality and more expensive than an extrusion molding.  Extrusion molding is a continuous process resulting in a constant cross-section, whereas injection modeling is not—it allows for varying cross-sections of objects.  Therefore, in regards to the disclosure of the '905 Patent, the wind deflection strip is cut from a single tube of material, requiring its cross-sections to be identical throughout its entire length.

C.   **"The Legs (44, 46) Form Therebetween an Angular Hollow Space that Expands from an Upper Narrowest Point of the Base Downwardly to the Upper Band Surface of the Support Element"**

| Claim Term | |
|---|---|
| the legs (44, 46) form therebetween an angular hollow space that expands from an upper narrowest point of the base downwardly to the upper band surface of the support element | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | the legs (44, 46) throughout their length have an angular unfilled area that expands from an upper narrowest point of the base downwardly to the upper band surface of the support element |

This phrase appears in claim 1 of the '905 patent and is used to express that the two legs of the wind deflection strip have a hollow or unfilled space between them throughout their length.   The specification depicts this unfilled space in Figures 2 and 3.   Ex. 3, '905 patent, Figs. 2 and 3:



The specification further affirms that this leg arrangement continues throughout the length of the wind deflection strip:   "The cross sectional form of the wind deflection strip 42 . . . shown in FIGS. 2 and 4 is the same over the entire length so that these sections can be inexpensively extruded."   *Id.* at 4:51-54.   As a result, this Court should construe this term to be:   the legs (44, 46) throughout their length have an angular unfilled area that expands from an upper narrowest point of the base downwardly to the upper band surface of the support element.

### D. "Said Legs Contacting the Upper Band Surface at a Location Laterally Spaced from said Rubber-Elastic Wiper Strip"

| Claim Term | |
|---|---|
| said legs contacting the upper band surface at a location laterally spaced from said rubber-elastic wiper strip | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | said legs throughout their length contact the upper band surface at a location laterally spaced from said rubber-elastic wiper strip |

This phrase appears in claim 1 of the '905 patent. ADM's proposed construction—said legs throughout their length contact the upper band surface at a location laterally spaced from said rubber-elastic wiper strip—is consistent with the specification, and importantly, the prosecution history of the '905 patent. Crucially, this phrase was added during prosecution of the '905 patent, to get over very close prior art that disclosed a wind deflection strip. The patent applicants and Examiner discussed adding this claim limitation in an Interview. *See* Ex. 20, '905 File History, at 5/5/2005 Interview Summary, Continuation Sheet ("Applicant to consider adding additional language to define legs as contacting the upper band surface at a location spaced from the wiper strip."). Then, after adding this precise limitation in order for the '905 patent to be allowed, the Examiner stated:

> To clearly distinguish applicant's wind deflection strip from a possible combination of Egner-Walter with Lumsden, the point of contact of the free ends of the diverging legs with the upper band surface of the support element has been set forth as being laterally spaced from the rubber elastic wiper strip. Such finds clear support in figure 2.

*Id.* at 5/9/05 Examiner's Amendment at p. 2. Figure 2 is reprinted below, and illustrates that the legs of the wind deflection strip contact the upper band surface at a location spaced from the wiper strip:



said legs (44, 46) contacting the upper band surface at a location laterally spaced from said rubber-elastic wiper strip (14)

The specification further affirms this arrangement continues throughout the length of the wind deflection strip:  "The cross sectional form of the wind deflection strip 42 . . . shown in FIGS. 2 and 4 is the same over the entire length so that these sections can be inexpensively extruded."  *Id.* at 4:51-54. This precise claim limitation is *the* reason the Examiner allowed the '905 patent to issue.  Ignoring this key fact, Bosch now attempts to improperly broaden its claims to cover exactly what Bosch was denied during prosecution—a wiper blade in which the wind deflection strip *does* contact the wiper strip. Accordingly, this Court should adopt ADM's proposed construction of this term.

### E.   "The Two Legs (44, 48) of the Wind Deflection Strip (142 or 242) are Connected to Each Other by Means of a Wall (144 or 244) in the Vicinity of the Two Wiper Blade Ends"

| Claim Term |
|---|
| the two legs (44, 48) of the wind deflection strip (142 or 242) are connected to each other by means of a wall (144 or 244) in the vicinity of the two wiper blade ends |

| Bosch's Proposed Construction | ADM Proposed Construction |
|---|---|
| no construction proposed | Indefinite |

This phrase appears in claim 3 of the '905 patent, which is dependent on claim 1.  As written, the claim term is nonsensical and not subject to any reasonable interpretation that is supported by the specification.  Specifically, the claim term requires that a single wall exist simultaneously at *two* ends of the wind deflection strip.  The words of this claim phrase therefore result in an impossible result. Moreover, the Federal Circuit has "repeatedly and consistently has recognized that courts may not

redraft claims, whether to make them operable or to sustain their validity. … [I]n accord with our settled practice we construe the claim as written, not as the patentees wish they had written it." *Chef America, Inc.*, 358 F.3d at 1374 (Fed. Cir. 2004) (construing term "to" in claim limitation reciting "heating the resulting batter-coated dough to a temperature in the range of about 400°F. to 850°F" as requiring that the dough be heated **to** the specified temperature and rejecting argument that the claim should be construed to mean that the dough was heated **at** the specified temperature since any other construction would result in a dough that was burned beyond use—"As written, the claim unambiguously requires that the dough be heated to a temperature range of 400°F. to 850°F.").[15]  Furthermore, the issue of claim indefiniteness cannot be resolved by this Court imposing a claim construction that the word "wall" (singular) should mean "walls" (plural).  It is not only improper in light of all the reasons explained above, but also in light of the language of claim 4 (discussed immediately below) which depends on claim 3.  As is discussed in further detail below, claim 4 claims that "the wall" (singular) of claim 3 is "essentially perpendicular."  Consequently, claim 4 makes clear that the patent drafters did indeed intend to write claim 3 to claim "the wall" in the singular form. As a result, this Court should hold that this claim term is indefinite for failure to comply with 35 U.S.C. § 112.

F.  **"The Wall (144) is Aligned Essentially Perpendicular to the Support Element"**

| Claim Term | |
|---|---|
| the wall (144) is aligned essentially perpendicular to the support element | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | Indefinite |

This phrase appears in claim 4 of the '905 patent, which is dependent on claim 3 (claim 3 is

---

[15]  On March 21, 2011, ADM identified this limitation as being in need of construction in a letter to Bosch.  *See* Ex. 5, 3/21/11 Ltr. from ADM Counsel to Bosch Counsel.  Despite the obvious ambiguity in the limitation's wording, Bosch elected not to construe the term.  *See* Ex. 6, 4/8/11 Ltr. from Bosch Counsel to ADM Counsel.  But, as discussed above, there is not a single reasonable "plain meaning" to this term.  Bosch's inability to point to one meaning or another is further evidence that this term is insolubly ambiguous and, therefore, indefinite.

discussed immediately above).   As drafted, the claim phrase is indefinite because "the wall" lacks antecedent basis.   In other words, it is entirely unclear to which wall, "the wall" refers.   The wind deflection strip has precisely *two* ends—one at each end of the wiper blade—and the claim does not specify which of these two walls the phrase "the wall" refers to.   Indeed, the specification contemplates that these walls may be shaped differently from one another:   "It goes without saying that each of the two ends of two sections belonging to a wind deflection strip can be embodied differently in accordance with the measures outlined above."   Ex. 3, '905 patent, 2:33-36.   Because the claim provides no guidance in this regard, it is impossible to determine which "wall," must be perpendicular and satisfy this claim limitation, and thus this Court should hold the term indefinite.[16]

G.      **"Claw-Like Projections (56, 58)"**

| Claim Term | |
|---|---|
| claw-like projections (56, 58) | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | rounded projections shaped like a claw, as shown by part numbers 56 and 58 in Figures 2 and 3 |

The term "claw-like projections (56, 58)" is used in asserted claims 8 and 15 of the '905 patent to describe a particular claimed shape of projections that extend from the two legs of a wind deflection strip to curve around the support element of the wiper blade.   The patent drafters chose to include in the claim language itself the numerical denotations for these claw-like projections—56 and 58.   Therefore, ADM's construction reflects this decision on behalf of the patent drafters, and gives a visual aid to the trier of fact regarding the shape of the claimed "claw-like" projection.   Figures 2 and 3 are re-printed below, and item number 58 of Figure 3 has been blown-out to illustrate the shape of the "claw"

---

[16]   On March 21, 2011, ADM identified this limitation as needing construction.  *See* Ex. 5, 3/21/11 Ltr. from ADM Counsel to Bosch Counsel.  Despite the obvious ambiguity in the limitation's wording, Bosch elected not to construe the term.  *See* Ex. 6, 4/8/11 Ltr. from Bosch Counsel to ADM Counsel.  But, as discussed above, there is not a single reasonable "plain meaning" to this term.  Bosch's inability to point to one meaning or another is further evidence that this term is insolubly ambiguous and, therefore, indefinite.

projection claimed:



Bosch should not be permitted to improperly attempt to broaden the '905 claims to read-out this "claw-like" limitation. In other words, this claim limitation cannot be expanded to cover every shape of projections, but must be limited to "claw-like" projections of the variety illustrated by item number 56 and 58, and specifically written into the claim language. This impropriety by Bosch is particularly important because in this lawsuit Bosch has accused wiper blade products that do **not** have this claimed shape, but instead have plain flat projections. *See* Ex. 25. Accordingly, this claim term should be construed to mean rounded projections shaped like a claw, as shown by part numbers 56 and 58 in Figures 2 and 3.

**H.     "Wherein a Hardness of the Material for the Wind Deflection Strip (42) is at Most 40 Percent Greater than the Hardness of the Material for the Wiper Strip"**

| Claim Term | |
|---|---|
| wherein a hardness of the material for the wind deflection strip (42) is at most 40 percent greater than the hardness of the material for the wiper strip | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | Indefinite |

This terms is used in claim 11 of the '905 patent to purportedly claim a relative "hardness" of the wind deflection strip in comparison to the "hardness" of the wiper strip. However, the claim language does not recite a method for determining "hardness." There are numerous types of hardness tests, varying from "Shore" to "Rockwell" to "Brinell." *See* Ex. 21, Dr. J.T. Winowlin Jappes, et al. *A*

23

*Textbook of Engineering Materials and Metallurgy* 166-176, 166 (2006).  Whether a potential infringing product meets this claim limitation may vary based on the type of hardness tests implemented, as well as the test procedures used.  *See id.* at 175 (showing varying relationship between Shore A and Shore D hardness tests); *see also* Ex. 22, ASTM Standard D2240, Standard Test Method for Rubber Property—Durometer Test, at 2 ("no simple relationship exists between the measurements obtained with one type of durometer and those obtained with another type of durometer or other instruments used for measuring hardness.").[17]  Furthermore, if the patent drafters wanted to claim a particular type of hardness test, like for example Shore Hardness A, it certainly knew how to do so—indeed, unasserted claim 19 claims a particular value of Shore Hardness A for the wiper strip and wind deflection strip materials.  However, claim 8 uses the indefinite word "hardness," rendering it indefinite.  *See, e.g.*, *Amgen Inc.*, 314 F.3d at 1342 (Fed. Cir. 2003) (holding patent claim indefinite where there were two ways to measure the term "difference" as used in the claim).[18]

**I.** **"The Claw-Like Projections Extend from the Leg Ends (50, 52) into a Vicinity of a Wall (154 or 254), and Suitably Encompass End Regions (112) of the Support Element"**

| Claim Term | |
| --- | --- |
| the claw-like projections extend from the leg ends (50, 52) into a vicinity of a wall (154 or 254), and suitably encompass end regions (112) of the support element | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | the claw-like projections extend from the leg ends (50, 52) into an area near a wall (154 or 254), and the claw-like projections extend from the leg ends (50, 52) beyond the sides so as to surround and enclose the end regions (112) of the support element |

[17]  Also unclear is whether the "hardness" is measured on the final as-sold product, or measured on the raw material used to make up the wind deflection strip and wiper strip.

[18]  On March 21, 2011, ADM identified this limitation as being in need of construction in a letter to Plaintiff.  *See* Ex. 5, 3/21/11 Ltr. from ADM Counsel to Bosch Counsel.  Despite the obvious ambiguity in the limitation's wording, Bosch elected not to construe the term.  *See* Ex. 6, Ltr. from Bosch Counsel to ADM Counsel.  But, as discussed above, there is not a single reasonable plain meaning to this term.  Bosch's inability to point to one meaning or another is further evidence that this term is insolubly ambiguous and therefore indefinite.  In its Response, Bosch should not be permitted to sandbag ADM by presenting a claim construction for this term for the very first time.

This phrase is used in claim 15 of the '905 patent to describe how the claw-like projections of legs of the wind deflection strip wrap around the ends of the wiper blade.   ADM's proposed construction—the claw-like projections extend from the leg ends (50, 52) into an area near a wall (154 or 254), and the claw-like projections extend from the leg ends (50, 52) beyond the sides so as to surround and enclose the end regions (112) of the support element—is consistent with the claim language and specification.   This construction maintains the distinction already present in the claim itself between the end regions and the outer edge of the support element strips.   First, the specification explains that the claw-like projections extend throughout the length of the wind deflection strip so as to hold it onto the sides of the support element.   *See* Ex. 3, '905 patent, at 5:28-31 ("The free ends 50 and 52 of the legs 44 and 46 are likewise provided with claw-like projections 56 and 58, which suitably encompass the outer edge strips 36 of the spring strips 30.").   Next, the specification states that the legs are connected to each other at each end of the wiper blade by a wall located on either end.   *Id.* at 5:42-46.   This wall is outfitted with the same claw-like projections that are on the legs so as to surround and enclose the edge end of the wiper blade.   *Id.* 5:64-6:4 ("In FIG. 6, the claw-like projection of the wall 144 of the section 140 has been labeled with the reference numeral 154.   ***The claw-like projections 56, 58*** in the exemplary embodiments according to FIGS. 1 and 3 and 4 and 6 ***are also used to cover*** the sharp, ***free end edges of the support element*** 12 . . .")(emphasis added); *see also id.* at 6:17-20 ("FIG. 7 also shows that claw-like projections 254 are likewise disposed on the wall 244, which suitably encompass end regions 112 of the support element 12 that is indicated with dot-and-dash lines.");   Figure 7 is re-printed below:



Additionally, the plain meaning of the word "encompass" supports ADM's proposed construction.  *See* Ex. 23, Webster's II New College Dictionary 371 (2001, 1999, 1995) ("encompass. 1. To form a circle about:  SURROUND.  2. To envelop:  enclose.").  Accordingly, this term should be construed as: the claw-like projections extend from the leg ends (50, 52) into an area near a wall (154 or 254), and the claw-like projections extend from the leg ends (50, 52) beyond the sides so as to surround and enclose the end regions (112) of the support element.

**J.      "End Regions"**

| Claim Term | |
|---|---|
| end regions | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| regions near the ends of the support element | area around and including the end |

The term "end regions" is used in claim 15 of the '905 patent to describe the location and shape of the claw-like projections at the end edge of the wiper blade.  Bosch's proposed construction—regions near the ends of the support element—is erroneous because it attempts to exclude the actual end of the wiper strip from the "end region" claim term.  On the other hand, ADM's proposed construction—area around and including the end—properly reflects the ordinary reading of the term to include not only the area around the end, but also including the end of the support element.  The specification supports ADM's construction.  It uses the term "end regions" to refer to the area around and including the end of the wiper strip.  *See* Ex. 3, '905 patent at 6:17-20 ("FIG. 7 also shows that claw-like projections 254 are likewise disposed on the wall 244, which suitably encompass end regions 112 of the support element 12 that is indicated with dot-and-dash lines.").  Figure 7 is re-printed on the preceding page of this brief.

**V.      THE PROPER CONSTRUCTION OF THE '607 PATENT**

The '607 patent generally relates to a combination of a wiper arm and a wiper blade.  *See generally*, Ex. 2, '607 patent.  Bosch accuses ADM's XF4 wiper blade product of indirect infringement

of twelve claims in the '607 patent (independent claim 1, and its dependent claims 2-7, 9-12 and 14). Bosch's allegations are limited to *in*direct infringement of the '607 patent because every claim requires a combination of both (1) a particular type of wiper arm (sometime called a side-lock arm), and (2) a wiper blade mounted on the arm, but ADM does not sell wiper arms anything like those in the '607 patent. Bosch must therefore resort to arguing that ADM indirectly infringes by inducing or contributing to the infringement by some other unknown direct infringer. Bosch has yet to identify any such direct infringer, despite ADM's discovery requests. Bosch's indirect infringement theory violates one or more of the doctrines of implied license, exhaustion, or permissible repair. Bosch also has no factual support for the intent and other elements unique to a finding of indirect infringement.

A.   **"On a Free End of Said Arm is Fixed On One End of a Cantilevered Joint Pin (56) with a Joint Axis"**

| Claim Term | |
|---|---|
| on a free end of said arm is fixed on one end of a cantilevered joint pin (56) with a joint axis | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | indefinite |

This limitation, found in claim 1 of the '607 patent, is insolubly ambiguous and therefore indefinite. On its face, the limitation is grammatically nonsensical—the only way to make sense of the claim is to delete either the second occurrence of the word "on" or the second occurrence of the word "of." Depending on whether the word "on" or "of" is removed, one of ordinary skill in the art could understand the limitation to have one of two meanings.[19] Claim 1 therefore has an ambiguous scope because this limitation has two reasonable interpretations. Bosch itself seems to be at a loss as to what

---

[19]   Eliminating the word "of" would require the cantilevered pin be fixed *on one end of a wiper arm*, but would not require the pin be fixed to the arm *at one end of the pin.* Alternatively, eliminating the word "on" would require the pin be fixed to the wiper arm *at one end of the pin* but would not require the pin be fixed at *one end of the wiper arm* itself.

27

the proper of this limitation should be.[20]  Bosch's inability to point to one meaning or the other is further

evidence that this term is insolubly ambiguous and, therefore, indefinite.  *Amgen Inc.,* 314 F.3d at 1342

(Fed. Cir. 2003) ("That the court recognized that one of ordinary skill in the art would have been faced

with this 'conundrum' should have ended the inquiry, for such ambiguity in claim scope is at the heart

of the definiteness requirement of 35 U.S.C.A. § 112, ¶2. One cannot logically determine whether an

accused product comes within the bounds of a claim of unascertainable scope."); *Geneva*

*Pharmaceuticals, Inc.*, 349 F.3d at 1384 (Fed. Cir. 2003)("[O]ne of skill would not know from one

bacterium to the next whether a particular composition standing alone is within the claim scope or not.

That is the epitome of indefiniteness. This court therefore rejects this proposed construction.")

**B.     "The Bearing Bore (36) is Disposed in the Coupling Part (30) Near One End
        Thereof"**

| Claim Term | |
|---|---|
| the bearing bore (36) is disposed in the coupling part (30) near one end thereof | |
| **Bosch's Proposed Construction** | **ADM Proposed Construction** |
| no construction proposed | the bearing bore (36) is disposed in the coupling part (30) and is located close to one longitudinal end of the coupling part and closer to that end than to the other longitudinal end of the coupling part |

This limitation is found in dependent claim 6 of the '607 patent. All of the intrinsic evidence

supports ADM's construction.  First, the claim language itself requires that the bearing bore must be

closer to one side of the coupling part than it is to the other side.  By its explicit terms, claim 6 requires

that "seen in the longitudinal direction of the wiper blade" the bearing bore must be "disposed in the

coupling part" and be "near one end thereof."  In other words, when the coupling part is viewed in the

longitudinal direction of the wiper blade, the bearing bore must be "near one end" of the coupling part.

---

[20]  On March 21, 2011, ADM identified this limitation as requiring construction.  *See* Ex. 5, 3/21/11 Ltr. from ADM Counsel to Bosch Counsel.  Despite the ambiguity in the limitation's wording, Bosch elected not to construe the term, relying instead on the terms "plain meaning."  *See* Ex. 6, 4/8/11 Ltr. from Bosch Counsel to ADM Counsel.

Logically, then, in order to be near one end of the coupling part, the bearing bore must also necessarily be closer to the end that it is "near" than it is to the other longitudinal end of the coupling part.  If this were not the case, then the limitation would have no meaning whatsoever, as any bearing bore could meet the limitation regardless of its relative closeness to either side of the coupling part.  But claims should not be construed in a manner that would render claim language superfluous or meaningless.  *See e.g., Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention . . ."); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir. 2000) (refusing to adopt a construction which would render claim language superfluous).  Accordingly, in order to give the limitation any meaning, the bearing bore must be closer to one longitudinal end than the other.

The specification of the '607 patent further supports this construction.  First, the specification specifically distinguishes between the end of the coupling part closer to the bearing bore, and the "other end"—implying that the bearing bore is close to one, but not both, ends of the coupling part:

> Bearing bore 36 is located in the block-shaped section 34 of the connecting part, near one of the longitudinal ends thereof. ***At the other longitudinal end*** is connected to section 34 of device part 30 a groove 38 oriented transverse to the longitudinal direction of wiper blade 14, said groove at its top being open toward the side facing away from carrying element 26."

'607 patent 4:31-37 (emphasis added).  Additionally, every figure shows a bearing bore (36) (also known as the hinge axis 55) closer to one longitudinal end of the coupling part (30) than the other longitudinal end:



While there are multiple examples of bearing bores that are closer to one longitudinal side of the coupling part than to the other side of the coupling part, the '607 patent contains no examples of a coupling part with a bearing bore that is equidistant to both longitudinal ends of the coupling part.[21] Accordingly, ADM's proposed construction should be adopted.

## VI.     CONCLUSION

For the reasons set forth above, ADM respectfully requests that this Court adopt ADM's proposed claim interpretations.

---

[21]  The accused "bearing bore" in the ADM wiper blades is located in the precise middle of the accused coupling part.

DATED:  April 22, 1011                By: */s/ Craig D. Leavell*_____

Michael D. Rounds, Nevada Bar No. 4734
Adam K. Yowell, Nevada Bar No. 11748
WATSON ROUNDS
5371 Kietzke Lane
Reno, Nevada  89511-2083
Telephone:  (775) 324-4100
Facsimile:  (775) 333-8171
E-Mail:  mrounds@watsonrounds.com
E-Mail:  ayowell@watsonrounds.com

Russell E. Levine, P.C., *pro hac vice*
Craig D. Leavell, *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
E-Mail:  russell.levine@kirkland.com
E-Mail:  craig.leavell@kirkland.com

*Attorneys for Defendants.*

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on April 22, 2011, I caused the foregoing **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** with the Clerk of the Court for the District of Nevada using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing: Jennifer L. Braster, Richard M. Cowell, Vincent C. Ferenbach, Jeffrey S. Ginsberg, Mark Hannemann, Robert W. Hernquist, Michael J. Lennon.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System: None.

By: */s/ Craig D. Leavell*
       Craig D. Leavell